# Philadelphia and Reading Railroad Company *versus* Boyer.

97 91
129 520
97 91
139 375

1. In an action against a railroad company to recover damages for the death of a person caused by a collision between a train of the defendants and a street passenger car in which the deceased was travelling, the plaintiffs, in order to recover, must show (1) that the death resulted directly from the negligence of the defendants' servants, (2) that the servants of the carrier company were guilty of no negligence.

2. In such case, the measure of duty of the carrier company is extraordinary care; that of the non-carrying company is merely ordinary care according to the circumstances.

3. The fact that a collision took place raises no presumption of negligence by the non-carrying company. It was, therefore, error to instruct the jury that if they found that the carrier company was not guilty of negligence their verdict should be for the plaintiffs against the non-carrying company defendant.

4. Where the tracks of a passenger railway company cross those of a

[Phil. & Reading Railroad Co. *v.* Boyer.]

steam railway company at grade, the driver of a car on the road of the former company is not justified in attempting to cross the track of the latter company without stopping, looking and listening, no matter what the action of the flagman of the latter company stationed at the crossing may be, if such driver have from other sources information which would lead a prudent man to infer that there was danger to be apprehended from an approaching train.

5. A municipal ordinance of Philadelphia provides that conductors of passenger railway cars shall stop their cars and cross the tracks of steam railroads in advance of their cars, under a penalty for failure. *Held*, that the ordinance does not apply to cars on which one man acts as both conductor and driver. *Held, further*, that a municipal ordinance creates no new liability in favor of one injured by the negligence of another.

6. Whether the Act of April 4th 1868 (Pamph. L. 58), limiting the pecuniary liability of railroad companies for death caused by negligence, is a general law, applicable to companies which have not accepted it as part of their charter; and if so, whether it has been repealed by the Constitution of 1874, not decided.

January 17th and 18th 1881.   Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ. (Reargument.)

Error to the Court of Common Pleas, No. 4, of *Philadelphia county :* Of July Term 1878, No. 35.

This case was first argued February 12th and 13th 1880. SHARSWOOD, C. J., and GREEN, J., having been absent, a reargument was ordered before a full bench.   At the first argument the court permitted the counsel for the plaintiff in error to file two additional assignments of error, hereinafter referred to.

This was an action on the case, by Mary R. Boyer, widow, and Maria M. Boyer et al., minor children of Jacob P. Boyer, deceased, against the Philadelphia and Reading Railroad Company, to recover damages for the death of the said Jacob P. Boyer, caused as alleged by the negligence of the company defendant.

The *narr.* averred that Jacob P. Boyer was killed by a collision between a car of the Thirteenth and Fifteenth Streets Passenger Railway Company in which he was riding, and a locomotive and train of the company defendant, caused by the negligence of the defendant's servants.   Pleas not guilty ; and that the collision was caused, or contributed to, by the negligence of the driver of the Passenger Railway Company, in driving the said car on and upon the railroad of the defendants, in front of the locomotive, without taking the precaution of stopping, looking and listening.   Replication denying the facts alleged in the pleas, and issue.

The case was tried January 29th 1878, before BRIGGS, J.   The facts, as developed on the trial, were as follows :  The Germantown and Norristown branch of the Reading Railroad Company, a double-track road, running out from the city of Philadelphia, approaches and crosses Broad street, north of Huntingdon street, at grade, at an acute angle.   On the morning of March 6th 1877,

[Phil. & Reading Railroad Co. *v.* Boyer.]

between 6.30 and 7 o'clock, Jacob P. Boyer and four others, policemen of the city of Philadelphia, were passengers in a one-horse passenger railway car of the Thirteenth and Fifteenth Streets Passenger Railway Line, which was proceeding northwardly along Broad street, under the charge of a driver alone, without a conductor. As the passenger-car was crossing the railroad track at the intersection, it was struck by a locomotive and train running on the north track toward Germantown. Three of the passengers escaped out of the rear door of the horse car just before the collision, but Boyer and one other passenger failed to escape and were killed.

The testimony showed, that by reason of the houses on the east side of Broad Street and on Huntington street, a person going northwardly out Broad Street, cannot see a train coming from the city, after he passes Huntington street. There would be no danger from a train which could be seen at Huntington street, because it would have passed Broad street before a passenger-car could reach the crossing. The danger comes from trains that have not yet reached the point of the track which can be seen from Huntington street. As the passenger-car approached very near to the railroad track, a man walking near the track, shouted to the driver, when the flagman of the defendant company came out of his watch-box, which is at the intersection. The testimony as to the actions of the flagman was conflicting. The flagman testified that he waved his flag across the street railway, and observing that the driver was standing at the car-door, not holding the reins, and paid no attention to his signal, he shouted to him "Are you going to stop?" when the driver picked up his lines and whipped the horse, to get over. The driver testified, that he heard no whistle or bell; that on approaching the track he slowed up; but when the flagman came out of his box, with his hands in his pockets, and the flag rolled up under his arm, and made no signal and said nothing to him, assuming everything was right, he continued to drive on, thinking that if there was any danger, the flagman would stop him.

The witness, Martin V. Spencer, testified, that he was coming south along Broad street, at the time of the accident, and saw a train coming at a high rate of speed from the city, and the driver of the street car approaching the crossing apparently unconscious of danger; he heard the train whistle below Cumberland street, and seeing no flagman out, he shouted to the driver, who commenced winding up his break; the flagman then came out of his box, said to Spencer, "Let him come on," and beckoned with his flag rolled up, to the street car to come on, and it drove on to the south track. Seeing that a collision was inevitable, he, Spencer, jumped back off the track, when almost immediately, the collision occurred, the locomotive striking the passenger-car a few feet in front of the rear platform. The driver had room to stop, when the witness first called to him.

[Phil. & Reading Railroad Co. *v.* Boyer.]

There was conflicting testimony as to the speed of the train, and whether the whistle was blown or the bell rung on approaching the Broad street crossing. The train hands testified that they were running at the usual rate of speed, about nine miles an hour; that the usual Broad street whistle was blown and the bell rung; and that the flagman gave the signal of danger by waving the car to stop. Other witnesses said the train was running about twenty or twenty-five miles and hour, and that no whistle was blown or bell rung, after passing Cumberland street, until the engine was almost on the street car. When the car was struck, it was thrown or carried across Broad street a distance of about fifty feet, and the engine stopped about two hundred yards beyond the intersection.

The evidence on the subject of the measure of damages was as follows: Jacob P. Boyer was, at the time of his death, in his forty-fifth year, a policeman, receiving $2.25 per day; he left surviving him a widow and seven minor children, six boys and one girl (the plaintiffs), whose ages ranged between three years and twenty. This family was entirely dependant upon the deceased for their support.

The defendants put in evidence the following ordinance of councils: "Sect. 1. The Select and Common Councils of the city of Philadelphia do ordain, that all passenger railway companies in the city of Philadelphia, whose tracks cross any steam railroads at grade, shall, before their cars cross such road, compel their conductors to stop all cars and cross the tracks of such steam railroads in advance of the cars, under a penalty of fifty dollars for each and every violation of such order, the same to be recoverable as sums of like amount are recoverable by law."

It was proved that a copy of this ordinance was hung up in the office of the passenger railway company, and the superintendent of the company testified that all drivers were instructed to come to a full stop before crossing the railroad at the Broad street intersection, and not to cross until the flagman told them to go on.

The defendant submitted, inter alia, the following points: 2. That to entitle the plaintiffs to recover in this action, the jury must find from the evidence that the collision resulted from the want of ordinary care on the part of the Philadelphia and Reading Railroad Company, without negligence on the part of the driver of the passenger-car; the mere fact that a collision took place raises no presumption of negligence on the part of the Philadelphia and Reading Railroad Company.

Ans. "In view of the continuous passage of the people of this city over the intersection of Broad street and the Reading Railroad, the company was bound to exercise the highest degree of caution, vigilance and observation while running trains over the intersection, in order to prevent injury to those in the street pass-

[Phil. & Reading Railroad Co. *v.* Boyer.]

ing over the defendant's track, that a cautious, vigilant and observant man could possibly exercise. But in view of the conceded fact that the defendants had placed a flagman at this point to warn back those approaching the intersection upon the occasion of a passing train, the defendant's servants in charge of the train were not bound to presume that one would pass on to the track at such time as to be struck by the train, and hence the company's train-servants were only bound to the exercise of ordinary care. The company's servant, however, in charge of the flag was bound to the exercise of the highest possible care to prevent this accident. If he did not, upon this occasion, exercise such care, then his principal, the defendant, was not only guilty of negligence, but negligence of the grossest character. You must, however, take my answer to this point in connection with my instructions in my general charge, that if the negligence of the servants of the Thirteenth and Fifteenth Streets Passenger Railway Company contributed to the killing of Jacob P. Boyer, the defendant is not liable."

3. That it was the duty of the driver of the passenger-car to stop before reaching the railroad, and to look and listen for approaching trains; and if the jury believe from the evidence that he failed to do so, the plaintiff cannot recover in this action, and the verdict must be for the defendants.

Ans. "In view of the testimony that the flagman beckoned to the driver to come on, this point is declined."

4. That it was the duty of the conductor, who was also the driver of the passenger-car, to stop the car and cross the tracks of the railroad company in advance; and if the jury believe from the evidence that he failed to do so, the plaintiffs cannot recover in this action, and the verdict must be for the defendants.

Ans. "This point is declined for the same reason as is given in the last answer."

In the general charge the court said, inter alia:

"Before you can render a verdict against the defendant you must be satisfied that the Reading Railroad Company was negligent in its relation to Boyer's death, and that the Thirteenth and Fifteenth Streets Passenger Railway Company did not contribute at all, by its negligence, in producing his death. That is to say, in order to recover a verdict against the Reading Railroad Company, the evidence must be satisfactory that the negligence that caused the death of Mr. Boyer was exclusively the negligence of the Reading Railroad Company, the defendants before us.

[If you find, however, from the evidence before you, in its entirety, that there was no negligence on the part of the Thirteenth and Fifteenth Streets Passenger Railway Company, then you have no trouble, and should, without a moment's hesitation, reach the conclusion that it is your duty to find a verdict against these

[Phil. & Reading Railroad Co. *v.* Boyer.]

defendants.] For it is beyond all peradventure a conceded fact, from every aspect of the case, and by both counsel in the case, that Mr. Boyer was killed by the passenger railway car being thrown violently from its track by the Reading Railroad train. And there is no evidence whatever in the case for me to submit to you that there was any negligence on the part of Mr. Boyer himself; that is frankly and manfully conceded by the counsel of the Reading Railroad Company also.

" Therefore, the principal question for your inquiry is, was the passenger railway company negligent, through its servants, or not? Did their negligence contribute to produce his death ? If it did, then your verdict must be for the defendant, for the reasons I have stated before. If not, then your verdict must be, if you are true to your duties, for the plaintiffs.

" [If the story of the driver is true, then he had no signal. If the story of Spencer, the colored man, is true, then the flagman, on whom as great a responsibility as can rest upon any human being rested, was guilty of the grossest negligence.]

" But I say to you unqualifiedly, advisedly, feeling keenly the responsibility that rests upon me, in view of the importance of the case to us in the relation it occupies to this dense centre of population and the geographical position of this intersection, known to me, and of which I am bound by law to take notice, and that people are constantly passing that point during the business hours of the day, [that the highest degree of care, responsibility, vigilance and observation rested upon that flagman that could possibly be exercised by a man possessing care, vigilance and observation, under the same circumstances.]

" [The law as to him is not ordinary care, it is extraordinary care. It is that care springing from the fact that human life may be imperiled if he does not exercise it, and as the law values human life, so does it tax him with the exercise of his utmost faculties to protect human life. There he stood a sentinel of this character, and if he did not come up to the full measure that the law affixes to his office, then this defendant company was not only guilty of negligence, but it was guilty of negligence of the grossest kind.]

" Now, I define the law sharply, and I do it advisedly. I mean what I say, and there must be no shrinking by you nor by me ; for servants occupying the relation that this flagman did to this deceased man must be taught that human life is worthy the exercise of the utmost of human vigilance. * * *

" [But if the driver was beckoned on by the flagman, or told to come on by the flagman, then that flagman being stationed there especially for the purpose of giving warning, the driver was justified in responding in action to the invitation by going on. And if you find that to be so, there is no negligence on

the part of the passenger railway company, and the verdict in that aspect should be against the Reading Railroad Company.]

"If you find that these defendants are liable, then proceed to assess the damages. The standard of damages is a pecuniary one; that is, what has been the inconvenience in dollars and cents to this widow and these children, in consequence of the death of the husband and father? That is the pecuniary inconvenience. You cannot consider the suffering that he sustained by reason of the fright. What would he have brought to the family had he lived? What fortune would he have made? Would he have made any fortune beyond the lot of toil that he was laboring in at the time? How long would he have probably lived? You have his age, and you have the means, with your knowledge of the length of human life, to aid you in ascertaining. These are the elemental outlines that the law furnishes to the jury, by which they are to ascertain the measure of damages that the aggrieved parties are entitled to. Consider all the testimony in the case, and render, in view of the legal propositions that I have given you, just such a verdict as your sense of justice dictates to you."

The verdict was for the plaintiff in the sum of $12,000, afterwards reduced by the court to $10,000, for which sum judgment was entered against the defendants. The defendants took this writ of error, assigning for error, the answers to their points and the portions of the charge quoted in brackets. At the first argument, the court permitted the defendants' counsel to file the following additional assignments of error: (12.) The verdict of the jury assessing the damages at a greater amount than $5000, was erroneous. (13.) The court erred in entering judgment for a greater amount than $5000, the amount limited by law.

*James E. Gowen*, for the plaintiff in error.—The court erred in holding as matter of law, that if the jury found there was no negligence by the passenger railway company, the verdict should be for the plaintiffs. Under the pleadings, it was the duty of the plaintiffs to prove, not only that the passenger railway company was innocent, but that the defendant was guilty of negligence. In so holding, the court usurped the province of the jury: Madara *v.* Eversole, 12 P. F. Smith 160; Work *v.* Maclay, 2 S. & R. 415; Huston *v.* Barstow, 7 Harris 169; Hart *v.* Girard, 6 P. F. Smith 23; Moore *v.* Miller, 8 Barr 272; Tenbrooke *v.* Jahke, 27 P. F. Smith 392. The court further erred in its definition of the degree of care required of the flagman; and in telling the jury, that if he did not comply with the standard so laid down, it was conclusive of the defendants' negligence. The second point should have been affirmed without qualification. The negligence of the car driver, in failing to stop, look and listen, before attempting to cross the track, embodied in the third point, should have been

1 OUTERBRIDGE—9

affirmed.     Such precaution was necessary, irrespective of any action by the flagman.   In view of the ordinance of councils, such failure was negligence *per se:* Railroad Co. *v.* James, 1 W. N. C. 68; Pennsylvania Canal Co. *v.* Bentley, 16 P. F. Smith 30; Johnson *v.* Bruner, 11 Id. 58; Citizens Ins. Co. *v.* Marsh, 5 Wright 386; Schultz *v.* Pennsylvania Railroad Co., 6 W. N. C. 69; Girard Avenue Passenger Railway Co. *v.* Middleton, 3 Id. 486; McCully *v.* Clarke, 4 Wright 406; Crissey *v.* Railroad Co., 25 P. F Smith 83.   The verdict as to the excess over $5000, is in direct conflict with the Act of April 4th 1868 (Pamph. L. 58), which limits the amount to be recovered in actions against railroad companies for negligence to $3000 in case of personal injuries, and to $5000 in case of death.

[SHARSWOOD, C. J.—What have you to say on the question as to the constitutionality of that act?]

A distinction is to be taken between the limitation in case of personal injuries and that in case of death.   As to the former, the act may be unconstitutional without affecting its constitutionality as to the latter.   This court has said, that the right to recover for personal injuries is a common-law right, which cannot be abridged by the legislature: Central Railway of New Jersey *v.* Cook, 1 W. N. C. 319; Thirteenth and Fifteenth Streets Railway Co. *v.* Boudrou, 11 Norris 475.   But the right of the widow and children to recover damages for the death of the husband and father, is a purely statutory right, and is capable of restriction and limitation by the legislature.   The validity of this portion of the act was established in Cleveland and Pittsburg Railroad Co. *v.* Rowan, 16 P. F. Smith 393, and Pennsylvania Railroad Co. *v.* Keller, 17 Id. 300; and since the constitution of 1874, it has been held, that the Act of 1868 was not *ipso facto* repealed by article III., section 21 of the constitution: Pennsylvania Railroad Co. *v.* Langdon, 11 Norris 21.

*Rufus E. Shapley*, for the defendant in error.—The answers to the defendant's points and the charge of the court below, as a whole, contain no error.   The learned judge expressly told the jury, that before they could render a verdict against the defendant, they must be satisfied that the Reading Railroad Company was negligent, and that the passenger railway company was not; and although he expressed his opinion on the testimony, he left all questions of fact to the jury.   In charging that the flagman was bound to use extraordinary care, he referred to the extraordinary danger at this hazardous crossing, which fact was undisputed, and the instruction practically was, that he was bound to use such care as the circumstances of the case reasonably demanded.   In view of the admitted fact, that an approaching train could not be seen from the passenger railway track, the flagman's duty was to give

[Phil. & Reading Railroad Co. v. Boyer.]

warning by an unmistakable signal, and whether he did so or not was left to the jury. The rule requiring one attempting to cross a railroad to stop, look and listen, is not an unbending one, applicable to every case. Where, from the nature of the crossing, such precautions will not apprise the traveller of danger, and a flagman on duty invites him to come on, he is not only justified in doing so, but would be held guilty of negligence were an accident to happen, by reason of his disregarding the signal: Wharton's Law of Negligence, sect. 387 (ed. 1874); Borst v. Lake Shore Railroad Co., 4 Hun 346; Cleveland Railroad Co. v. Crawford, 24 Ohio St. 631; Kennayde v. Pacific Railroad Co., 45 Mo. 255; Tabor v. Missouri Valley Railroad Co., 46 Id. 353; Newson v. N. Y. Cent. Railroad Co., 29 N. Y. 383; Beisiegel v. Same, 34 Id. 622; Brown v. Same, 32 Id. 597; Sweeny v. Old Colony Railroad Co., 10 Allen 368; Spencer v. Illinois Cent. Railroad Co., 29 Iowa 55; Warner v. N. Y. Cent. Railroad Co. 45 Barb. 299.

Although it may not be negligence for a railroad company to omit to keep a flagman at a crossing, yet, if one is employed, his neglect to perform the usual and ordinary functions of the place is sufficient to charge the company: Kissenger v. N. Y. & Harlem Railroad Co., 56 N. Y. Court of Appeals 538; Reading Railroad v. Killips, 8 W. N. C. 526.

A defendant cannot impute a want of vigilance to one injured, if that very want of vigilance was the consequence of an omission of duty on the part of the defendant: Kennayde v. Pacific Railroad Co., 45 Mo. 255; Tabor v. Missouri Valley Railroad Co., 46 Id. 353; Pennsylvania Railroad Co. v. Ogier, 11 Casey 60; Mc-Cully v. Clarke, 4 W. N. C. 186; Johnson v. West Chester Railroad Co., 20 P. F. Smith 366; Allegheny Valley Railroad Co. v. Findley, W. N. C. 438.

A rate of speed over twenty-five miles an hour in a populous neighborhood of a city is too great, and rebuts any presumption of negligence on the part of a party run over and killed by the train while attempting to cross the street: Hagan v. Railroad, 5 Phila. 179, affirmed in 11 Wright 244.

This being a one-horse car, without a conductor, the ordinance of councils does not apply to the case. A municipality cannot by ordinance create a civil duty enforcable at common law; that power reposes in the legislature: Philadelphia and Reading Railroad Co. v. Ervin, 8 Norris 71.

As to the constitutionality of the Act of 1868, in Langdon's Case, the Pennsylvania Railroad Company had formally accepted the act before the date of the new constitution, under the provisions of its fourth section, and they specially pleaded it and proved it in the case, as part of their charter, which was not affected by the constitution. While the judge who wrote the opinion intimated his view, that the act was not repealed by the constitution, the

case was decided solely upon the ground the act formed part of the charter. In this case, there is no evidence that the Reading Railroad Company ever accepted the act, and we must assume that they did not. The questions now arise, therefore, is the Act of 1868 a general law? and, if so, was it repealed by the constitution? A reference to the debates of the constitutional convention will show, that the intention of the framers was absolutely to repeal acts limiting damages, referred to in the first sentence of art. III., sect. 1, of the constitution, as well as those limiting the time within which suits might be brought, referred to in the second sentence of that section. See punctuation, &c., on second reading, and amendment on third reading, Debates, vol. 5, p. 292. The constitution of Pennsylvania, unlike the constitution of the United States, is not to be construed strictly, but liberally, in furtherance of the intention of the people, and in favor of their rights: Weister *v.* Hade, 2 P. F. Smith 474; Cronise *v.* Cronise, 4 Id. 255; Moers *v.* City of Reading, 9 Harris 188.

Even if the act is in force and constitutional, a reversal would be improper, as this court can reduce and correct the verdict and judgment below.

Mr. Justice GORDON delivered the opinion of the court, January 31st 1881.

Jacob P. Boyer, to recover damages for the loss of whose life this action has been brought by his widow and children, was, on the 6th day of March 1877, a passenger on a car of the Thirteenth and Fifteenth Streets Passenger Railway Company, and, as this car was moving across the tracks of the Philadelphia and Reading Railroad, it was struck by a passing locomotive: the result was the wreck of the car and the loss of two lives, that of Boyer being one of them.

The success of this action depends upon the establishment of two assumptions: (1.) That the death of Boyer resulted directly from the carelessness of the defendant's servants; (2.) That the person in charge of the street car was chargeable with no negligence. It is only on this hypothesis that this suit can be maintained, for the rule is, that, where a passenger on a carrier vehicle is injured by a collision resulting from the mutual negligence of those in charge of it and another party, the carrier alone must answer for the injury: Lockhart *v.* Lichtenthaler, 10 Wright 151. On this theory the case was tried, and the principal point on which it turned was the question, whether the driver of the horse-car was or was not guilty of contributory negligence. This, of course, was exclusively for the jury, and it was error for the court to assume as true any fact upon which that body had to pass: Elkins *v.* McKean, 29 P. F. Smith 493. When, therefore, in answer to the plaintiff's third point, asking instruction, "that it

was the duty of the driver of the passenger-car to stop before reaching the railroad, and look and listen for approaching trains, and, if the jury believe from the evidence he failed to do so, the plaintiff cannot recover, the court said: "In view of the testimony that the flagman beckoned the driver to come on, this point is declined;" the rule as above stated was violated, for the court assumed as true, the very fact of all others upon which the case turned, since the only possible excuse for the driver for his neglect in not stopping his car was the fact, if fact it was, that the flagman did beckon him to cross the track. His duty to the passengers under his care was of the highest order, whilst that of the flagman as an employe of the railroad company was but secondary. He was bound to but ordinary care. The learned judge, however, seems to have inverted this order, for he says: "The highest degree of care, responsibility, vigilance and observation, rested upon the flagman, that could possibly be exercised by a man possessing care, vigilance and observation, under the same circumstances." Had he applied this language to the driver of the horse-car, it would have been unexceptionable, but to apply it to the flagman was erroneous. It is true that that care, called ordinary care, must vary according to circumstances. What would be ordinary care in handling building-sand would be gross negligence in handling gunpowder; so, the care to be exercised in running a locomotive through a crowded city is something very different from that required in driving the same kind of vehicle through the open country; nevertheless, in both cases the care required is that only which a man of ordinary prudence would exercise under like circumstances. All this, the court might and ought to have told the jury. But it had no right to impose upon the company the duty of extraordinary care; that was the obligation resting upon the driver of the street-car, and upon him alone. From what has been said, it follows that the defendant's second point should have been affirmed without qualification, except, perhaps, to explain what ordinary care under the circumstances would be.

Furthermore, the learned judge erred in the following instruction: "If you find, however, from the evidence before you in its entirety, that there was no negligence on the part of the Thirteenth and Fifteenth Streets Railway Company, then you have no trouble, and should, without a moment's hesitation, reach the conclusion that it is your duty to find against the defendants.'

Here, again, is an assumption in which the court ought not to have indulged. From the evidence such a conclusion might possibly follow, but it was for the jury to draw it, not the court.

Again, the court said: "If the story of the driver is true, then he had no signal. If the story of Spencer, the colored man, is true, then the flagman on whom as great a responsibility as can rest upon any human being rested, was guilty

of the grossest negligence." But if the driver had no signal; if the flagman, as the driver himself says, came sauntering out of his box with his flag rolled up, under his arm, giving no heed to the railroad or what was upon it, what, under such circumstances, was the driver's duty? Under his care was the safety of his passengers; upon him rested the superior duty. Surely he ought to have stopped, looked for himself, or asked the flagman so to do; and this the more so, as Spencer was doing all in his power to warn him of the coming danger. The fact is, resting the case wholly upon his own and Spencer's testimony, the driver did not exercise that care which, under the circumstances, was required of him. He had the lives of five men under his charge. He was approaching a place of known danger. Had he stopped for one moment, he would have heard the noise of the approaching train. Spencer was directly in front of him, shouting and gesticulating in order to induce him to stop, and, instead of heeding this warning, with a curse he orders Spencer out of the way, and drives on. Now, suppose the flagman did beckon him on; tell him to go on: what was his duty as a prudent man? How could he help knowing that a train was coming? He was not only warned of the fact, but, had he used his eyes, he might have seen it. It is, therefore, well nigh certain that his attempt to cross the tracks at that time, even under the supposition that the flagman signalled him so to do, was the result either of criminal carelessness or gross stupidity. One man told him to stop, another to go on; was he not to pause and judge between them, by the sure witness of his eyesight? Surely this is a proposition of easy solution, and one, had it been properly submitted, that ought not to have given the jury much trouble. Again, the answer to the defendant's fourth point was wrong, because it assumes the fact, as in the answer to the third point, that the flagman actually did beckon the driver on. The court might have refused this point. It was not necessary for the driver to cross the tracks in advance of his car. This would have been proper had there been a conductor in charge of this vehicle, but as there was only a driver, this could not be done. Had he stopped, where he could have had a proper view of the road, and looked and listened, he would have discharged his whole duty. This point embodies the city ordinance, regulating the passage of railroad tracks by street-cars; an excellent regulation, and one that should be strictly enforced; but, as we have said in the case of the Railroad Co. v. Ervin, 36 Leg. Int. 244, a municipal ordinance creates no new liability in favor of one injured by the negligence of another; hence, had the driver of the car observed the proper precautions, though they might not have conformed strictly to the directions of the ordinance, that would have been sufficient to have thrown the responsibility of the accident on the defendant, if its servants were negligent; never-

[Phil. & Reading Railroad Co. *v.* Boyer.]

theless, the court, having undertaken to answer this point, should have done so in a proper manner, and not by an assumption of the prerogative of the jury.

We do not deem it proper now to discuss the exception to the entry of judgment in excess of $5000, the limit prescribed by the Act of 1868. It does not appear that the Philadelphia and Reading Railroad Company ever formally accepted the provisions of that act so as to make them part of its charter. Under such circumstances, whether the act applies at all to non-accepting companies, is an important question, and a still more important question is, admitting it thus to apply as a general law, though not part of the company's charter, what effect has the Constitution of 1874 upon the statute by way of repeal? Should the case ever come before us again, which is not likely, it may be presented in a better shape for the discussion of these questions, but for the present we pass them.

The judgment is reversed, and a new venire is ordered.